**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0661-24

JOHN G. PINTO and
DANIELLE PINTO,

     Plaintiffs-Appellants,

v.

LUCIANA PAULA PINHEIRO,
NISSAN INFINITI LT., and
SIMON L. PURYEAR,

     Defendants,

and

ALLSTATE NEW
JERSEY PROPERTY AND
CASUALTY INSURANCE
COMPANY,

     Defendant-Respondent.

_____

Argued May 12, 2026 – Decided July 28, 2026

Before Judges Sumners and Augostini.

On appeal from the Superior Court of New Jersey, Law Division, Ocean County, Docket No. L-2303-20.

William D. Wright argued the cause for appellants (The Wright Law Firm, attorneys; William D. Wright, on the briefs).

John C. Prindiville (John C. Prindiville PA) argued the cause for respondent.

PER CURIAM

Plaintiff John Pinto and Danielle Pinto[1] appeal from a September 30, 2024 final judgment entered in favor of defendant Allstate New Jersey Property and Casualty Insurance Company (Allstate) following a jury verdict of no cause of action. The jury found that John did not sustain a permanent injury to his neck because of the motor vehicle accident underlying this litigation.

Plaintiff argues the trial court erred in admitting evidence of his lower back injury and prior accident, which influenced the outcome of the trial requiring reversal and remand. Having reviewed the trial record and governing legal principles, we affirm.

---

[1] Because John and Danielle share a surname, we refer to them by their first names in this opinion to avoid confusion. No disrespect is intended. While both John and Danielle are referred to as plaintiffs in the caption of this appeal, before the jury began deliberating, plaintiffs withdrew their loss of consortium claim involving Danielle. Hereafter, we refer to John only as plaintiff in this opinion.

A-0661-24

I.

A. The Accident

On November 18, 2018, John was headed to work driving eastbound on Route 36 in Eatontown.  As the three-lane highway merged into two lanes, defendant Luciana Pinheiro side-swiped John's vehicle as she attempted to pass him on the right.  John testified that there was "this jolting back and forth between these two cars" in which Pinheiro's car "end[ed] up wrapping around the front" of his before "going off into the grass median in the middle" while the third car "stopped a little ways up on the left on the shoulder."  At the time of the accident, Allstate insured John.

After the accident, John called Danielle to let her know he had been in an accident and was okay.  He then spoke to the police, rented a car, and went to work.  While at work, he testified that his "neck really started . . . to bother[]" him as it "stiffened [and] . . . tensed up."  Because of this, John went to the hospital where "they did some x-rays on [him] and stuff like that."

John testified the medical staff told him that he "had pretty extreme inflammation all up in [his] neck area, and [his] trapezoid area, to the point that they actually had to give [him] a steroid injection in [his] rear" and "anti-inflammatory medications."  Although John was "in pain" he was discharged

A-0661-24

that day and followed up almost three weeks later with Dr. Robert Sabo, a neurosurgeon. Dr. Sabo saw John three times over a four-month period for treatment. During this time, John underwent an "MRI of the cervical spine[,]. . . cervical spine x-rays, . . . [a]nd . . . EMG testing." According to Dr. Sabo's medical records, "he describe[d] [John's] range of motion as being mildly restricted."

Dr. Sabo referred John to physical therapy which he started on January 9, 2019. John testified that he went to approximately fifteen to twenty therapy sessions but only received minimal relief. Dr. Sabo recommended a pain management specialist for further treatment. John began seeing Dr. John Coccaro, a pain management specialist, for further treatment.

## B. The Litigation

On October 2, 2020, plaintiff filed a complaint against defendants Luciana Pinheiro, Nissan Infiniti LT, and Simon Puryear, asserting negligence and loss of consortium.

The claims against Nissan and Puryear were voluntarily dismissed with prejudice. Plaintiffs then filed an amended complaint on March 8, 2022, naming defendant Allstate. In addition to the previous causes of action, the amended complaint lodged an additional cause of action for an uninsured/underinsured

4

motorist claim against Allstate.[2]   On April 8, 2022, plaintiff settled with Pinheiro, dismissing claims against her with prejudice.

On September 18, 2024, plaintiffs filed their pretrial submissions as well as two motions in limine seeking to bar: (1) a doctor's note in one of John's medical records and; (2) testimony referring to John's prior back injury and prior motorcycle accident.

On September 24, 2024, the court held an off-the-record conference regarding pending in limine motions.  On the record, the court barred any testimony about the medical record note and the cost of future treatment.  The court did not formally address the motion regarding John's prior back injury or prior motorcycle accident, nor does the record contain a written order on the in limine motions.

Trial was conducted on September 23 through September 25, 2024.  The only issue was whether the 2018 accident caused John permanent injury.  John and Danielle testified and called two expert witnesses: (1) Dr. Coccaro, John's pain management provider; and (2) Dr. Justin Kubeck, a board-certified

---

[2]  The record is unclear as to the resolution of this claim.  It does not appear that the jury addressed this claim.

A-0661-24

orthopedic surgeon. Allstate called one witness: Dr. David Lopez, also a board-certified orthopedic surgeon.

## C. Expert Testimony

Dr. Coccaro testified that he first saw John on March 27, 2019, "approximately five months" after the accident, when John "had been complaining of right-sided neck pain." He testified that John was still a patient of his at the time of trial, stating he saw John "[w]ithin the past month. I think I saw him last week[] in fact" before clarifying, "[b]ut for different things."

Dr. Coccaro reviewed John's medical history and did not find any indication of a preexisting condition or prior injury to his neck. John performed various range of motion tests, which the doctor agreed were "subjective." Contrary to Dr. Sabo's assessment of his range of motion, Dr. Coccaro described John as having "severe limitation of motion."

Dr. Coccaro also reviewed John's diagnostic imaging and testing and opined the MRI "was essentially normal," despite finding a "small central disk herniation . . . at the 3-4 disc," which Dr. Coccaro "felt was . . . definitely asymptotic" and "not significant." Dr. Coccaro opined the EMG was "negative." Ultimately, Dr. Coccaro diagnosed John with "[t]raumatic spondylosis, or whiplash-associated disorder" also referred to as facet syndrome. Although

A-0661-24

there was no evidence from the MRI that the facet joints had been damaged in some way as a result of the car accident, Dr. Coccaro explained "you don't always see facet disease on a[n] MRI."

Dr. Coccaro described the two types of treatment he provided to John: diagnostic medial branch blocks and radio frequency ablations. He "did four sets" of medial branch blocks and a total of two radio frequency ablations. Dr. Coccaro explained that afterwards, a patient can expect "anywhere from nine to [fifteen] months of . . . relief," although "[w]ith some people, the pain comes back sooner and some a lot later" as the "nerves do regenerate."

Dr. Coccaro opined that John would need the procedure "every one to two years" "[p]robably [for] the rest of his life." He reasoned that it was "an innocuous injury to the sinovium of the facet joint" which "just progresses."

Dr. Kubeck examined John five years after the accident in 2023.[3] Dr. Kubeck found that John had "an objective limitation in his range of motion," and "had tenderness over his facet joints in the back of his neck on the right[-]hand side." Dr. Kubeck agreed that John suffered a traumatic injury to his facet joints in the crash. He opined that the injury was permanent, with John's symptoms "wax[ing] and wan[ing] over time" and "most likely w[ould] require

---

[3] The record does not specify the exact date of evaluation.

A-0661-24

lifelong pain management with radio frequency ablations done over again." Dr. Kubeck explained that John would most likely need to see Dr. Coccaro on a regular basis because his pain would return.

Although Dr. Kubeck acknowledged that John's range of motion appeared more limited than it did five years ago, he dismissed arthritis as the cause because "the diagnostics that [he] reviewed d[id]n't really indicate any significant arthritis," reasoning "you're talking about a guy who was less than [forty] years old." Thus, Dr. Kubeck did not agree with Dr. Coccaro's diagnosis of spondylosis. Both doctors agreed that there had been an injury to the facet joint as a result of the accident; however, they differed as to whether that injury progressed over time or whether, in part, it worsened due to arthritis. Dr. Kubeck testified that he saw no evidence of any arthritic change in the facet joints and further provided that "it wouldn't make sense that all of a sudden [John's pain] stopped being related to the accident and was related to, to something other than the accident."

Regarding John's treatment, Dr. Kubeck explained that spinal injections "serve[] both a therapeutic and a diagnostic function" because "other diagnostic images that [doctors] would typically rely on, [such as] an EMG and an MRI" are "not going to show too much" "with a facet injury like this." However,

A-0661-24

"when you're targeting a specific spinal structure with the injection, if that helps with their pain, you then can say, all right this is where their pain is coming from."

Allstate called Dr. Lopez as an expert witness to testify regarding his evaluation of John. Dr. Lopez testified that he reviewed John's MRI images and found "some age-related changes, degeneration of the facet joints" or "in other words[,] some arthritis." According to Dr. Lopez, these "age-related changes" "take years to develop" and "happen gradually."

Dr. Lopez's physical examination of John showed "no tenderness," "involuntary muscle spasm around his spine in the neck," and his "[r]eflexes were normal indicating normal nerve function . . . both in the . . . arms and legs." When evaluating his range of motion, Dr. Lopez found it to be "comparable to normal for an individual without neck complaints."

Dr. Lopez diagnosed John with "a sprain to the cervical spine" which he described as "a stretch [injury] to the ligaments and soft tissues about the neck." He reasoned that "a strain would be more consistent with [John's] initial presentation" in that he did not "requir[e] any urgent medical care, but . . . he did go to the emergency room . . . which would be expected."

9

Dr. Lopez further testified that treatment would consist of "physical therapy and that sort of non-invasive treatment" but "as far as injections . . . that's more related to those degenerative changes . . . in the facet joint areas" to "address the abnormalities or the pain-related to those abnormalities seen [in the MRI] which are not resulting from the motor vehicle accident." Dr. Lopez reasoned that a sprain resolves within three to four months, which coincided with the therapy he received related to the car accident. He further explained that once the sprain injury had resolved, any remaining treatment "would be related to those [degenerative] changes . . . that look and are preexisting."

Further, Dr. Lopez explained that John's medical records gave "quite a bit of insight into the . . . lack of necessity for medication" as "there were no additional prescriptions outside of the emergency department relating to pain for five to six months until [John] started his . . . pain management injections" which "indicates . . . resolution of his accident-related injuries." Given that "degenerative changes don't go away," Dr. Lopez testified that it "would not be surprising" if John was still receiving radio frequency ablations.

After deliberation, the jury returned a no cause verdict in favor of Allstate by a seven to zero vote. Plaintiffs did not move to set aside the verdict and for

A-0661-24

a new trial.  On September 30, 2024, the trial court entered judgment on the jury's verdict.  This appeal followed.

Plaintiffs contend the trial court erred in permitting testimony about John's lower back injury and prior motorcycle accident and further contend that these purported evidentiary errors substantially influenced the outcome of the trial, requiring reversal and remand.

## II.

We review "the trial court's evidentiary rulings for abuse of discretion." State v. Mauti, 448 N.J. Super. 275, 307 (App. Div. 2017) (quoting State v. Gorthy, 226 N.J. 516, 539 (2016)).  An abuse of discretion "arises on demonstration of 'manifest error or injustice,'" Hisenaj v. Kuehner, 194 N.J. 6, 20 (2008) (quoting State v. Torres, 183 N.J. 554, 572 (2005)), or when "there has been a clear error of judgment," State v. Brown, 170 N.J. 138, 147 (2001) (quoting State v. Marrero, 148 N.J. 469, 484 (1997)). See also State v. Scharf, 225 N.J. 547, 572 (2016) (assessing relevance); State v. Nelson, 173 N.J. 417, 470 (2002) (weighing probative value versus prejudice).  "In particular, '[c]ourts have a broad discretion in determining the scope of cross-examination.'" Manta v. Pereira, 436 N.J. Super. 330, 343 (App. Div. 2014) (alteration in the original) (quoting State v. Silva, 131 N.J. 438, 444 (1993)).  Thus, the reviewing court

11

"will reverse an evidentiary ruling only if it 'was so wide off the mark that a manifest denial of justice resulted.'" Griffin v. City of E. Orange, 225 N.J. 400, 413 (2016) (internal quotation marks and citations omitted) (quoting Green v. N.J. Mfrs. Ins. Co., 160 N.J. 480, 492 (1999)).

Prior to trial and relevant to the issues on appeal, plaintiffs moved in limine to bar testimony regarding "hearsay statements about a ten-year old diagnostic study that [did] not exist." Reference to the "diagnostic study"—full spinal MRIs—was contained in a medical note in John's records. The court granted the motion to redact any testimony to those older MRIs in the de bene esse testimony of the medical experts. Consistent with the court's ruling, there was no testimony regarding the prior MRIs.

Also, before trial and relevant to the issues on appeal, plaintiff moved in limine to bar "any reference to a prior [lower back] injury or motor[cycle] accident." Plaintiff's counsel also requested a ruling on reference to any lower back injury:

> PLAINTIFF[']S COUNSEL:   And mention of a lower back injury is not in this case. And that part's obviously also out as well, am I correct?
>
> THE COURT: Yes, I would agree.[4]

---

[4] The record does not contain a signed order memorializing the trial court's in limine rulings.

A-0661-24

The court did not rule on the admissibility of any evidence related to the prior motorcycle accident before trial.

The two errors raised on appeal relate to the admission of Danielle's testimony regarding John's lower back injury and John's testimony pertaining to a prior motorcycle accident. Plaintiff argues that despite the trial court's decision barring this evidence, it erroneously permitted this testimony.

### A. Lower Back Injury

We begin with plaintiffs' contention regarding the admission of testimony about John's lower back injury. Plaintiff contends that the trial court granted the in limine motion barring any testimony about his lower back injury and subsequently erred by permitting testimony about the injury, nonetheless. He further argues that testimony regarding his lower back injury was not relevant, and even if deemed relevant, it was improper to allow it because no medical evidence was offered to support its connection to the 2018 accident. We are unpersuaded.

The only explicit testimony regarding John's lower back injury occurred during Danielle's cross-examination. However, before Danielle's testimony, Dr. Coccaro testified on direct that he had last seen John for treatment as recently as last week, although "for different things."

Danielle was then questioned regarding her involvement in John's medical appointments and was asked if she was aware that Dr. Coccaro had testified that John remained under his care but was being treated for different reasons. Plaintiff objected, arguing "these questions are about a low back injury" and the "issue of low back injury" was "not relevant." The trial court overruled the objection, finding that because John testified he never injured his spine, if Danielle had information to the contrary, the court would permit it.

Danielle was next questioned about the nature of John's continuing treatment with Dr. Coccaro. She acknowledged that John was recently receiving epidural shots for his lower back condition.

> Q. And does low back pains something that would prevent him from doing some of . . . the things that you described such as lifting weights or . . .
>
> A. I don't know. Maybe the lower back would [a]ffect him for lifting weights above his head, I don't know that.
>
> Q. Okay. Um, so you're aware of the treatment, right? And he's had injections?
>
> A. Yes.
>
> Q. But you don't know how he injured his low back?
>
> A. I don't know. No, I don't know how he injured his lower back. He didn't have any fall or anything like that, no.

A-0661-24

Q. Okay. And do you know when he first started complaining about his low back?

A. Not exactly – no, I don't.

Q. Okay. But . . . he's gotten continuing treatment from Dr. Coccaro since he's going there?

A. Correct.

Allstate contends that even though the court previously ruled that such evidence would not be permitted, it properly permitted this testimony because plaintiff's expert, Dr. Coccaro, "opened the door" when he testified to his continuing treatment of John. "The 'opening the door' doctrine is a 'rule of expanded relevancy and authorizes admitting evidence which otherwise would have been irrelevant or inadmissible in order to respond to (1) admissible evidence that generates an issue, or (2) inadmissible evidence admitted by the court over objection.'" State v. Prall, 231 N.J. 567, 582 (2018) (quoting State v. James, 144 N.J. 538, 554 (1996) (emphases omitted)). The doctrine prevents a party from excluding inadmissible evidence, then "selectively introducing pieces of this evidence" without allowing a party "to place the evidence in its proper context." James, 144 N.J. at 554. "The doctrine is limited, however, by weighing the probative value against the prejudicial nature of the evidence under N.J.R.E. 403." Prall, 231 N.J. at 583 (citing James, 144 N.J. at 554).

A-0661-24

As a result of the direct questioning of Dr. Coccaro, his testimony appeared to suggest that John was continuing to receive treatment for injuries related to the accident up until a week prior to trial. Although Dr. Coccaro stated that the treatment was "for different things," his response to counsel's question created a misleading impression, or at a minimum an unclear impression, that John remained under treatment for his neck injury. This testimony, elicited by plaintiff's counsel, opened the door for defendant to inquire into and clarify the true nature and scope of John's current treatment to provide the jury with an accurate understanding of his current medical condition. See Hrymoc v. Ethicon, Inc., 254 N.J. 446, 473 (2023) ("The doctrine of opening the door allows a party to elicit otherwise inadmissible evidence when the opposing party has made unfair prejudicial use of related evidence." (quoting James, 144 N.J. at 677)); see also Bender v. Adelson, 187 N.J. 411, 433 (2006) (holding "untrue statements or inferences" may constitute undue prejudice).

Plaintiff further asserts that this cross-examination of Danielle was improper because it elicited irrelevant testimony regarding John's lower back condition and was "likely to confuse the jury." However, Allstate counters that this line of questioning was relevant to assist the jury in its assessment as to

whether John's lower back condition impacted his ability to perform everyday tasks.

John testified how the neck injury he sustained in the 2018 accident has affected his daily routine. For instance, he explained that he used to be "pretty big into the gym and lifting weights" and now, because of his injury, "[t]hat's kind of been destroyed for [him]." Evidence that John sustained a lower back injury, for which he continues to receive pain management treatment, is relevant in determining whether his alleged inability to perform everyday tasks such as "lift[ing] light weight without bringing on severe pain" or "lifting overhead" was attributable to his lower back injury or, as he contended, to his neck injury.

The jury, as the fact finder, was required to assess whether John's alleged limitations in performing everyday tasks or recreational activities resulted from the neck injury he sustained in the motor vehicle accident or whether other extraneous factors contributed to his claimed damages. Notably, the trial court instructed the jury to consider various factors including "similar relevant facts in evaluating the probable consequences of any injury [the jury] find[s] [John] has suffered." Thus, the jury was entitled to consider and weigh all evidence bearing on this issue to reach their conclusion. See State v. Muhammad, 182 N.J. 551, 577 (2005) (explaining the courts have "long recognized that '[a] jury

is not bound to believe the testimony of any witness, in whole or in part'" in order to reach its decision (alteration in original) (quoting State v. Bentley Bootery, Inc., 128 N.J.L. 555, 561 (1942), aff'd, 129 N.J.L. 386, 387 (E. & A. 1943))). In other words, "[j]urors may reject what in their conscientious judgment ought to be rejected and accept that which they believe to be credible." Ibid. (citation and internal quotation marks omitted).

Plaintiff also contends that even if John's lower back injury was relevant, John did not testify about his condition on direct examination, and no medical expert testified regarding its logical connection to John's neck injury as required under Paxton v. Misiuk, 34 N.J. 453 (1961). However, when John testified, evidence that he was currently receiving treatment for other conditions had not yet been testified to; thus, the door had not yet been opened. See State v. Anastasia, 356 N.J. Super. 534, 542-43 (App. Div. 2003) (explaining rebuttal evidence may be offered after the opposing party has "open[ed] the door").

Further, plaintiff's reliance on Paxton is misplaced. In that case, Paxton sustained injuries as a passenger in Misiuk's vehicle that struck a utility pole. Paxton, 34 N.J. at 459. Paxton alleged he suffered a cervical spine injury as a result, whereas Misiuk alleged his injury pre-existed the collision. Ibid. The Court determined that in response to an allegation that Misiuk's negligence

caused Paxton's injury, Misiuk was permitted to demonstrate by competent evidence that the injury complained of could have been "caused, wholly or partly, by an earlier accident or by a pre-existing condition." Id. at 460 (citing Krug v. Wanner, 28 N.J. 174, 185 (1958)). Where a party seeks to introduce evidence of a prior accident or pre-existing condition as an alternative theory of medical causation, the admissibility of such evidence is determined by a standard of possibility rather than probability. Id. at 461.

Here, evidence of John's lower back injury was not proffered to address causation requiring expert medical opinion. Indeed, causation was not an issue; there was no evidence suggesting that John's neck injury could have been caused by an earlier accident or a pre-existing condition. Nor does Allstate allege that John's lower back injury contributed in any way to his neck injury. Rather, only Danielle and not any of the experts testified about John's lower back injury, and she stated that she was unsure when John began complaining about his lower back. Moreover, Allstate reiterated in summation that John's lower back injury was unrelated to the car accident and to his neck injury. Therefore, we discern no abuse of discretion by the trial court in permitting Danielle's testimony regarding John's lower back injury.

19

## B. Prior Motorcycle Accident

We next address plaintiff's contention that John's testimony regarding a prior motorcycle accident was improperly admitted because there was no medical evidence to support a connection between John's neck injury and this prior accident. Further, plaintiff argues that because there was "no evidence" that John was "even diagnosed with an injury from that accident—only that he had a CT scan of his head in the emergency room"—there was no basis to admit the testimony. We disagree.

As the trial court explained, testimony regarding John's involvement in a motorcycle accident for which he was taken by ambulance to the hospital but claimed he was not injured, was relevant to assessing his credibility. This testimony was introduced to impeach his credibility after he testified at trial that he had never suffered a neck or head injury before the 2018 accident. We agree that Allstate's reason for questioning John about the prior motorcycle accident was not offered to challenge medical causation, but rather, to attack John's credibility.

Counsel is permitted to attack the credibility of a witness on cross-examination. N.J.R.E. 611(b). "[A]ny fact which bears against the credibility of a witness is relevant to the issue being tried" and a party "has a right to have

that fact laid before the jury in order to aid them in determining what credit should be given to the person testifying." State v. Bass, 224 N.J. 285, 302 (2016) (quoting State v. Pontery, 19 N.J. 457, 472 (1955)). Thus, "[a]ny witness 'may be cross-examined with a view to demonstrating the improbability or even fabrication of his testimony.'" Parker v. Poole, 440 N.J. Super. 7, 22 (App. Div. 2015) (quoting Silva, 131 N.J. at 444 (citation and internal quotation marks omitted)).

Further, "[a] prior inconsistent statement may be used to attack the credibility of a witness." Ibid.; see also N.J.R.E. 607 ("For the purpose of attacking or supporting the credibility of a witness, any party . . . may examine the witness and introduce extrinsic evidence relevant to the issue of credibility. . . ."). "Although extrinsic evidence may be admitted to impeach a witness . . . its probative value as impeachment evidence must be assessed independently of its potential value as substantive evidence." Green, 160 N.J. at 494-95.

In addition to his testimony, John initially provided certified interrogatory responses omitting any prior injuries to his head or neck  He later amended his answers to state that he was involved in a motorcycle accident whereby he struck his head, lost consciousness, and received subsequent medical attention involving a CT scan of "the whole upper head area and neck area." Despite

amending his answers, at trial, John testified on direct that he never had an injury or received medical attention for his neck—directly contradicting his prior statement. On cross-examination, before confronting John with his discovery responses, he again denied any prior injury to his neck or back.

Under these circumstances, Allstate confronted John with his interrogatory answers to impeach his credibility with evidence contradicting his testimony and not for substantive purposes—as Allstate reiterated in their closing that the motorcycle accident did not relate to any of John's current injuries. John was provided with an opportunity to explain why his current testimony was inconsistent with his prior discovery responses, in which he provided that he did not classify being knocked unconscious as the result of a motorcycle accident as a "treatable injury."

We are satisfied that the trial court did not abuse its discretion in allowing this testimony as relevant to the jury's assessment of John's credibility. See Conrad v. Michelle & John, Inc., 394 N.J. Super. 1, 5 (2007) ("[A] jury is free to accept or reject, in whole or in part, any version of a witness's testimony."). Moreover, John's testimony about the motorcycle accident, and the extent to which that testimony might bear upon the jury's evaluation of his credibility and overall reliability regarding his testimony concerning his neck injury, were

22

matters properly within the jury's province.  See Morales-Hurtado v. Reinoso, 457 N.J. Super. 170, 190 (App. Div. 2018) ("Credibility determinations are to be made by the jury."); see also State v. Vandeweaghe, 177 N.J. 229, 239 (2003).

In sum, the trial court did not abuse its discretion in permitting testimony on John's lower back injury and prior motorcycle accident.  Moreover, even had the court not allowed this testimony, there is substantial credible evidence in the record to support the jury's verdict that John did not sustain a permanent injury to his neck as a result of the 2018 motor vehicle accident.

To the extent we have not addressed any of plaintiff's remaining arguments, those contentions lack sufficient merit to warrant discussion.  R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

A-0661-24